Maysonet v. Zamorano.

# MARÍA MAYSONET

## *v.*

# LA SUCS'N DE PEDRO ESTEBAN ZAMORANO.

------------

San Juan, Law, No. 1278.

AS TO JUDGMENT NON OBSTANTE VEREDICTO.

Citizenship—American.

    1. The English word is "subject" and the American word is "citizen," but they mean substantially the same, and the common-law rule applies in Porto Rico.

14th Amendment—Citizenship.

    2. The general American rule is that all persons born or naturalized in the United States and subject to the jurisdiction thereof are citizens of the United States.

Citizenship—After the Foraker Act.

    3. Where a father was a native of Spain but did not come to Porto Rico until after the Foraker Act, the children are not embraced within its provision making Porto Ricans out of Spanish inhabitants.

Porto Rican Legislation—Citizenship.

    4. Congress did not turn over to Porto Rico the question of establishing citizenship vel non.

Constitution—the Flag.

    5. The Insular Cases decided that the Constitution did not follow the flag except as to inherent natural rights of man which Congress did not disregard.

Sons of Aliens—Jones Act.

    6. By the Porto Rican Act people of Porto Rican birth, alien parentage, and permanent residence in Porto Rico, may become American citizens by taking the oath of allegiance in the Federal court.

Sons of Aliens—Exclusive.

    7. This provision determines the only way in which aliens of the class described may become American citizens.

Opinion filed November 26, 1919.

*Mr. H. R. Francis* for motion.

*Mr. Chas. Hartzell* for plaintiff.

HAMILTON, Judge, delivered the following opinion:

In this case the complaint alleged that the plaintiff was Porto Rican and that the minor defendants were Spanish citizens. On the trial the proof developed that the father of the minor defendants came to Porto Rico about the year 1906, that the minors were born here in 1908, 1910, and 1912, and that the father has registered both himself and the children at the Spanish Consulate from time to time with the view of retaining Spanish citizenship. On the trial the court declined to grant a motion to take the case from the jury, based on the theory of lack of diversity of citizenship. The same point is now presented after verdict for plaintiff, upon a motion to enter judgment for the defendants non obstante veredicto.

1. The American rule as to citizenship goes back to England, and the English rule no doubt is based upon the fact that that country is an island and interested in maintaining absolute independence in her institutions. It is true that the English word is "subject" and not "citizen" as in the United States, but the meaning of the two words is the same. Hennessy v. Richardson Drug Co. 189 U. S. 25, 34, 47 L. ed. 697, 698, 23 Sup. Ct. Rep. 532. As shown in the Tapia Case in this court, the word "citizen" came into use with the French Revolution, as a mark of distinction from a monarchy, the people of which were subjects of a sovereign. In a republic the people as a whole constitute the sovereign, and the constituent members are

Maysonet v. Zamorano.

called citizens. Despite the change of words, the English doctrine has prevailed in the United States. What is sometimes called the Jus Soli here prevails as distinguished from the Jus Sanguinis prevalent on the European continent. Indeed much of the treaty history of the United States centers around the American effort, now generally successful, to insist that residence is the basis of citizenship rather than original birth, while on the other hand continental countries have been reluctant to give up their right to citizens who have emigrated. Down to the treaty of Paris of 1899 it is quite true the continental theory, being part of the law of Spain, prevailed in Porto Rico, a province of Spain, and it is also true that for many purposes the Spanish Civil Law remains the law of Porto Rico. It would, however, be impossible to apply this rule to public matters. Whatever may be the rights of individuals over against each other and in connection with their property, which remains under the control of the civil law as retained in Porto Rico, public matters, all political bases, must be regarded as changed by the cession to the United States. It would be impossible for the United States to have one public law applicable in Porto Rico and another applicable in the states themselves unless Congress so enacted. Porto Rico, internationally, must be considered as thoroughly American as any state of the Union. Ex parte Garcia, 10 Porto Rico Fed. Rep. p. 516. If this case is dependent upon the question whether the principles of the civil or common law prevail, it would have to be settled in accordance with the latter. M'Creery v. Somerville, 9 Wheat. 354, 6 L. ed. 109; Lynch v. Clarke, 1 Sandf. Ch. 583.

2. If there ever was any question as to this point, it was set at rest by the adoption of the 14th Amendment in 1868 and

Maysonet v. Zamorano.

previously by the Civil Rights Act of 1866. Rev. Stat. § 1992, Comp. Stat. § 3946, 2 Fed. Stat. Anno. 2d ed. p. 115. The first section of the 14th Amendment declares that "all persons born or naturalized in the United States and subject to the jurisdiction thereof are citizens of the United States and of the state wherein they reside." This principle has been steadily adhered to by the Department of State and by all other branches of the government.

3. Article 9 of the treaty of Paris provided that "the civil rights and political status of the native inhabitants of the territories hereby ceded to the United States shall be determined by Congress." Under this article Congress has made several provisions, such as what is called the Foraker Act of April 12, 1900, and Jones Act of March 2, 1917. It is to be observed that the treaty refers to the "native inhabitants," and primarily at least this would mean those in existence at the time of the ratification of the treaty. The treaty has no provisions to be executed in future, except as to Spanish commerce for a limited period and the like. However, Congress under its general power as to territories of the United States proceeded to erect a government in Porto Rico called the People of Porto Rico, of such a character that it was to be considered as a quasi sovereignty, fully organized, but which the Insular Cases (Downes v. Bidwell, 182 U. S. 342, 45 L. ed. 1127, 21 Sup. Ct. Rep. 770 and Goetz v. United States, 182 U. S. 221, 45 L. ed. 1065, 21 Sup. Ct. Rep. 742), decided was not incorporated into the United States. All inhabitants continuing to reside therein who were Spanish subjects at the time of the treaty, and who then resided in Porto Rico, and their children born subsequent thereto, were deemed and held to be citizens of Porto Rico, and as such

entitled to the protection of the United States, excepting such as had elected to preserve their allegiance to the Crown of Spain. in accordance with the treaty. This, known as the Foraker Act, is similar in terms to the organic act of almost the same date for Hawaii, except that Hawaiians were made citizens of the United States, while the inhabitants of Porto Rico were declared to be citizens of Porto Rico. The way was thus left open for further approximation to American citizenship or for some form of dependency, "as such entitled to the protection of the. United States." This situation, with immaterial amendments, continued until the present Jones Act of March 2, 1917, which converted all but a very few of these citizens of Porto Rico into citizens of the United States by § 5. It was during this interval between the two acts that the plaintiffs in this case were born in Porto Rico, and it is under such conditions that their citizenship is to be determined.

They were not made Porto Ricans by the Foraker Act, for they were not born. Their father was a native of the peninsula of Spain, but did not come to Porto Rico until long after the Foraker Act, and so was not embraced in the provision making Porto Ricans of Spanish inhabitants of April 11, 1899.

4. It is claimed that Porto Rican legislation found in § 10 · of the Political Code made the plaintiffs Porto Ricans, inasmuch as it states that "the citizens of Porto Rico are: (1) All persons born in Porto Rico and subject to the jurisdiction thereof." The basis of this claim is not that Porto Rico was sovereign enough to establish citizenship, but that this Code, not being disapproved by Congress under § 31, is to be considered practically as Federal legislation. This section contains a proviso "that all laws enacted by the Legislative Assembly shall be

Maysonet v. Zamorano.

reported to the Congress of the United States, which hereby reserves the power and authority, if deemed advisable, to annul the same." In the first place, however, the provision in the Political Code applies not to all persons born in Porto Rico, but to the persons so born who are subject to the jurisdiction of Porto Rico; and a Spaniard is not subject to the jurisdiction except as a foreigner. Moreover, there was no occasion for Congress to annul this law, as it was subject to the general rules as to citizenship already estalished. Congress certainly is not to be held as turning over to Porto Rico the question of establishing citizenship vel non. If such a law were passed it would be void because ultra vires and the question must be solved on other than local grounds.

5. The Insular Cases decided that the Constitution did not follow the flag, that is to say, that the Constitution was not to be applied in its fulness to possessions acquired by the Army and the Congress, which acted themselves under the Constitution itself. In other words, that the United States, in an international sense, constitute one nation, with as full power to hold property and possessions outside of its constitutional limits as any other nation, and that its own internal organization was not necessarily applicable to such acquired territory, while on the other hand Congress could by appropriate legislation extend such internal organization to these new possessions in whole or in part. In the instance of Porto Rico the Insular Cases held that this had not been done. It is true this is modified by the principle that there are certain inherent natural rights of man which even Congress would be incompetent to disregard. What these are has not been accurately defined. In the case of Porto

XI. Porto Rico.—27.

Rico it was a subject of dispute under the Foraker Act what constitutional rights were conferred. This court held in the Cerecedo Case, 6 Porto Rico Fed. Rep. 607, 615, that the rights declared in the first eight amendments to the Constitution were so conferred, but this should be limited to the case then before the court, and did not apply to grand jury in criminal cases and petit jury in civil cases. In other words, these two are not natural rights of man.

Since March 2, 1917, the procedure of this court has been controlled by the Jones Act, and this in a preliminary Bill of Rights has been careful to define what parts of the Constitution are so extended to Porto Rico, omitting the rights to a grand and petit jury as before. The 14th Amendment was one of the constitutional landmarks in American history, and yet this Bill of Rights omits the first section of that historic amendment, being the one defining citizenship by birth in America subject to American jurisdiction. Even if this provision is to be considered as not extended to Porto Rico, it might still apply under the principles of the common law which existed prior to the 14th Amendment itself, and indeed supplied the basis for that amendment as it has for the whole American Constitution. Nevertheless it is still true this is not one of the fundamental rights of man which Congress cannot alter. Some discussion of what these rights are was had in the Tapia Case, 9 Porto Rico Fed. Rep. 452. · The question remains whether it is, under the legislation which Congress has passed, applicable to Porto Rico. That will be the decisive test in the case at bar.

6. The treaty of Paris and the Foraker Act concern themselves principally with the citizenship in Porto Rico of those who had been Spaniards, but in course of time it was found that

Maysonet v. Zamorano.

there were other aliens whose citizenship required attention, such as many sons of Frenchmen engaged in the coffee business about Yauco. Accordingly in the Organic Act of 1917 it was provided in § 5 that those who had been previously called Porto Rican citizens should become American citizens unless they disclaimed before a court of record within twelve months, and it was provided as to all natives of Porto Rico there residing who were children of aliens that they could become American citizens merely by taking an oath of allegiance before the Federal court for the district of Porto Rico. The exact wording of this provision is as follows: "That any person who is born in Porto Rico of an alien parent and is permanently residing in that Island may, if of full age, within six months of the taking effect of this act, or if a minor, upon reaching his majority or within one year thereafter, make a sworn declaration of allegiance to the United States before the United States district court for Porto Rico, setting forth therein all the facts connected with his or her birth and residence in Porto Rico and accompanying due proof thereof, and from and after the making of such declaration shall be considered to be a citizen of the United States." [39 Stat. at L. 953, chap. 145, Comp. Stat. § 3803bb, Fed. Stat. Anno. Supp. 1918, p. 611.]

This would seem to modify the common-law rule above discussed, by which everyone born in the United States and subject to the jurisdiction thereof becomes an American citizen. It may well be that the causa causans of this provision was the situation of coffee growers on the south side of the Island, but if so it would be analogous to the case of the former slaves in the southern states of the Union. The causa causans of the 14th Amendment was the negro, but that amendment is so

broad in its application as to cover everyone, regardless of color. So here the provision in § 5 of the Jones Act applies to all persons having three qualifications,—(1) Porto Rican birth (2) alien parentage, and (3) permanent residence in Porto Rico. The bulk of the residents of Porto Rico were taken care of by the general naturalization in the first part of § 5, and practically the rest of them not permanently alien are taken care of by the provision in question. The principle of expressio unius, exclusio alterius must apply. If the children of aliens were to be considered as already American citizens under the common law or in any other way, it would be useless to provide a method by which they could be made American citizens. The provision must be construed as saying, in effect, that unless they pursue this, the sole statutory method provided for becoming American citizens, they are not American citizens.

7. It would be impossible to disregard this provision of § 5 and treat it as a nullity because the subject is already covered by the common law. Congress is not to be deemed as enacting any provision without thought, and without intending it to mean something. If it conflicts with the common-law rule, the common-law rule to that extent must yield.

It is argued that the provision in § 5 can be satisfied by limiting it to the children of Frenchmen on the south side of the Island or to all aliens born prior to the Treaty of Paris. It would of course be possible for Congress to legislate as to these people so as to fix their status as of that of the treaty or the Jones Act, so as to secure treatment uniform in date with that of Porto Ricans generally. An insuperable objection to this view, however, is that while Congress might have limited the provision in this way, Congress did not so limit the provision.

Maysonet v. Zamorano.

On the contrary an act passed in 1917 must in any fair construction cover conditions existing in 1917, and therefore apply to all persons permanently residing in Porto Rico who have been born in that Island of an alien parent, whether French, Spanish, or any other nationality, at any time before March 2, 1917.

It is quite true that this establishes in Porto Rico a different rule as to citizenship of children of aliens from that prevailing in continental United States; but this is done by an act of Congress and must be presumed to be enacted, as in the case of other provisions as to Porto Rico, because of difference of conditions, making Porto Rico in the view of Congress to such extent different from other parts of the United States. It is for a court to interpret, not legislate.

The result of this discussion, therefore, is that legislation has fixed the status of people in the condition of the defendants as that of aliens, and as aliens they must be treated.

It follows, therefore, that there is a diversity of citizenship between the plaintiffs and defendant, and that the trial and verdict were proper. The motion to enter a judgment non obstante veredicto must be denied.

It is so ordered.